# AMERICAN EXCHANGE NATIONAL BANK, Appellant, *v.* WILLIAM ULM, et al., Respondents.

[Submitted April 4, 1898. Decided July 18, 1898.]

*Negotiable Paper—Collateral Security—Bona Fide Purchaser—Notice.*

A promissory note payable to the plaintiff was executed by the directors of a bank, including the president, to whom it was delivered for the purpose of borrowing money for the bank. The president used the note as collateral security for his own note to plaintiff, and the money thus borrowed was drawn by a check to the order of the cashier of the bank, which subsequenty transferred the proceeds to the private use of the president. There was nothing on the face of the note to indicate for what purpose the note had been given. *Held,* that the plaintiff was not bound to ascertain for what purpose the note was given; and that the makers were liable.

*Appeal from District Court, Cascade County; C. H. Benton, Judge.*

Action by the American Exchange National Bank against William Ulm and others. There was a judgment for certain defendants, and plaintiff appeals. Reversed.

Statement of the case by the justice delivering the opinion.

Suit by plaintiff and appellant bank upon a promissory note, copy of which is as follows: "$10,125.00. Chicago, October 25, 1892. Six months after date we promise to pay to the order of the American Exchange National Bank ten thousand one hundred and twenty-five dollars, at Chicago, value received. Interest at the rate of —— per cent. per annum. [Signed] Wm. Ulm. E. R. Clingan. John Sinclair. Will Hanks. S. N. Dickey. H. P. Rolfe. A. F. Longeway. T. E. Brady. A. Nathan."

The plaintiff credited certain payments upon the note, the last payment so credited being dated January 5, 1895. The balance sued for was $4,625, with interest. All the makers were made defendants. Certain of such makers answered to the effect that the note was signed by them, and delivered to the defendant Hanks, for the sole purpose of enabling Hanks to borrow thereon from the plaintiff the face of said note, for the use of the Merchants' National Bank of Great Falls, Mont., of which bank all the defendants were directors and said Hanks was president; that said Hanks, after receiving said note for the purpose aforesaid, delivered the same to the plaintiff bank, without authority, as collateral security for the payment of a certain promissory note for $10,000, executed and delivered by said Hanks to the plaintiff for a loan made by Hanks from the plaintiff for his own use, and that none of the makers of the note, other than Hanks, ever received any consideration for or on account of the note, and that no consideration was received by the Merchants' National Bank. Defendants also pleaded ignorance of the fact that the note had been delivered by Hanks to the plaintiff bank as collateral security for his own note until after the payments credited on the note had been made by them. They set up a counterclaim for the amount of said payments. Defendants Hanks and Sinclair were not served and did not appear. Judgment was rendered against the plaintiff, and in favor of defendants, who appeared and answered for the amount of their counterclaim. Plaintiff appeals.

*Leslie & Downing, Swift, Campbell & Jones,* and *H. G. McIntire,* for Appellant.

*J. P. Lewis* and *A. J. Shores,* for Respondents.

HUNT, J.—Inasmuch as there was practically no dispute as to the facts of the case, they may be stated as follows: The Merchants' National Bank of Great Falls, Mont., had an account with the American Exchange National Bank of Chicago at the time that the note in suit was transferred to the plaintiff bank. The Great Falls bank suspended in July, 1893. All of the defendants were directors of the Great Falls Bank, and Will Hanks was its president at the times hereinafter mentioned. In September, 1891, Hanks solicited a loan for $10,-125 for six months from the plaintiff bank. He offered plaintiff his individual note, and as collateral security a note for the same amount, on six months' time, signed by the defendants, Rolfe, Ulm, Longeway, Sinclair, Dickey, Clingan and Nathan, and also by R. R. Hotchkiss, D. H. Churchill and C. H. Austin, who were all at that time directors of the Merchants' National Bank of Great Falls. The Chicago bank was willing to make the loan, but objected to discounting a six-months' note; so it was agreed that Hanks should make his individual note for a shorter time, with the agreement that it could be renewed. On September 10, 1891, Hanks forwarded to the Chicago bank his individual note for $10,125, payable to the order of the Chicago bank 40 days after date, and sent therewith a note for the same amount, bearing the same date, payable six months after its date, to the order of the Chicago bank, which note was signed by Hanks, Rolfe, Ulm, Hotchkiss, Longeway, Sinclair, Churchill, Dickey and Clingan. Upon receipt of the note in Chicago, on September 15, 1891, the plaintiff bank discounted Hanks' note, and placed the full amount to his credit, and took the other note as collateral security, according to the arrangement with Hanks. Upon the same day of the receipt of the notes the Chicago bank received from the Great Falls bank a check drawn by Will Hanks upon the Chicago bank, to the order of George A. Wells, who was

cashier of the Merchants' National Bank of Great Falls, for the sum of $10,125, which check had been indorsed by Wells to the Chicago bank for account of the Great Falls bank, and which was sent by the Great Falls bank to the Chicago bank for credit to the account of the Great Falls bank. The Chicago bank paid the check by charging the same to the account of Hanks, and crediting the amount to the account of the Great Falls bank. But, however this might have been, it is conceded by the plaintiff that, "in the eye of the law," the use of the money by Hanks was not for the benefit of the bank, and was therefore a misappropriation of the proceeds of the note. Upon October 23, 1891, Hanks' note became due, and, according to the understanding originally had, it was renewed by another note for the same amount, payable on demand and in the same form. On March 26, 1892, Hanks delivered to the Chicago bank a new collateral note, and the first was surrendered to him. This new note ran for three months, and was signed by the same parties as the first note, except that Nathan signed in place of Hotchkiss. This note was held by the Chicago bank as collateral security for Hanks' demand note, until during October, 1892, when Hanks delivered to the Chicago bank a third note as collateral security for his demand note, and the second collateral note was then delivered to Hanks by the bank. Brady signed the third collateral note, and Churchill did not. The Chicago bank held the last-described note as security for Hanks' demand note, and it is the subject-matter of this action.

It also appeared in evidence that Hanks represented to the defendants, who made the first collateral note, that the Great Falls bank, of which they were all directors, needed funds, and that the Chicago bank would discount a note signed by them and the other makers, and that they thereupon signed the note and gave it to Hanks for discounting in the American Exchange National Bank, for the use of the Great Falls bank; that they signed the second note as a renewal of the first, and the third as a renewal of the second; and that they were ignorant of the use to which Hanks had put the three notes, or any

of them, until after they had made the several payments on the third note which were included in their counterclaim.

The defendant Nathan signed the second note upon like representations made by Hanks, and for the same purposes, but in ignorance of the first note. Brady signed the last note upon like representations made by Hanks, and for the same purposes that the other signers had signed the note, and he, too, was ignorant of the use to which Hanks put the note until after the payments had been made.

The Chicago bank had no knowledge or notice of the manner in which, or the purposes for which, Hanks obtained the signatures to the collateral notes, or either of them, and no knowledge or notice that said notes, or any of them, were given to Hanks to be discounted for the use of the Great Falls bank, but took the paper in good faith, as security for the money loaned to Hanks, and never knew of the purposes for which the collateral notes were delivered to Hanks until after it had received all the payments set up by the defendants in their counterclaim.

There was nothing upon the face of the note in suit to indi-, cate to the plaintiff what the purposes of the makers were in intrusting it to Hanks. It was an ordinary negotiable note, with several makers, in the hands of one maker, who was known to the plaintiff as the president of a bank with which plaintiff dealt in common banking intercourse. "When a note is executed for the purpose of raising money in the market, although made payable to a particular bank or firm, it is well understood that this is generally regarded by business men as rather a formal than a substantial part of the note. If the note were made payable at a particular bank, to the order of the maker, it would be much the same thing. So, too, if made payable to bearer generally. The name of the person to whom the note is payable is mere form. It is understood that it is going into the market as money, and in exchange for money, to any party who will make the discount. If negotiated at the bank, it may pass into other hands the next hour." (*Keith* v. *Goodwin*, 31 Vt. 268.) The rule is, too, that one who

signs negotiable paper for the accommodation of another con-
fers authority on the person accommodated to bind him (the
accommodation party) in favor of third persons by the issue
of the paper.    After negotiation, the maker of such paper is
bound to the payee, or indorsee, or holder.    Respondents can
claim no more favorable position than that of accommodation
makers.

Let us apply these principles to the actual facts.    The note
in suit was negotiated for the benefit of the bank, although
plaintiff, in ignorance of the real purposes of the note, loaned
the money to Hanks.    This appears from the evidence, which
shows that, after the note was deposited as collateral, Hanks
drew a check for the amount of it to the order of Wells, who
was cashier, who in turn deposited the amount to the credit of
the Great Falls bank, and to whose credit it was duly placed
by the Chicago bank.    Thereafter Hanks, by a transaction
with the cashier of the bank, seems to have obtained the money.
The makers of the note were not injured in any way by the
act of Hanks in pledging the note in the manner in which he
did, for it was not until the amount of the loan was credited
to the Great Falls bank that Hanks committed wrong against
these defendants.    He could have done the same thing if he
had discounted the note, and had put the funds directly to the
bank's credit instead of his own.    The object of the note was
to get money for the Great Falls bank.    The makers turned
the note over to Hanks, that he might carry out that purpose,
and he did carry it out, but thereafter misappropriated the
borrowed funds by diverting them from the bank's credit to
his individual uses.    There was in fact no wrongful misap-
propriation of the note, even if the precise mode of its use
was not that contemplated.    A fraudulent perversion of the
original object and design of negotiable paper is necessary to
constitute a misappropriation.    ''If the note has effected the
substantial purpose for which it was designed by the parties,
an accommodation indorser cannot object that the accommoda-
tion was not effected in the precise manner contemplated,
where there is no fraud, and the interest of the indorser is

not prejudiced.'' (*Duncan, Sherman & Co.* v. *Gilbert,* 29 N. J. Law 521; Daniel on Negotiable Instruments, Section 792.)

Respondents were not prejudiced by any act of this appellant, who took the note in perfect good faith, and without any reason at all to suspect that there were limitations upon its use. Indeed, there were none, except that the paper was for the purpose of raising money in Chicago for the use of the Great Falls bank. The Chicago bank ought not now to be held responsible for Hanks' misuse of the proceeds of the note. Respondents had confidence in Hanks, and gave him the note for a specific purpose, and now that he has defrauded them after effecting that purpose, by diverting the sum realized on the note, they, and not plaintiff, must suffer. (*Evans et al.* v. *Title Hardware Co.* (Ark.) 45 S. W. 370.)

Believing, therefore, that there was no wrongful diversion of the note, as contradistinguished from the proceeds thereof, as between the plaintiff bank and the makers of the note, common principles lead to the conclusion that the makers, and not an innocent holder, should be responsible for the personal confidence which they reposed in Hanks. The usages of commercial paper do not require banks, in their ordinary business affairs, to ascertain whether negotiable paper, apparently regular on its face and offered for discount, is or is not subject to a reserved agreement to which the bank is not privy, and of which it knows positively nothing, and of the possible existence of which the paper contains no information..

But assuming, without conceding, that there was a wrongful diversion of the note by Hanks from the special purpose for which the note was made and intrusted to him, we fail to see how respondents can escape liability. Plaintiff bank, having proved that it had no knowledge or notice of the fact that Hanks was guilty of a fraudulent diversion of the note, and having parted with something of value for it when it loaned the money to Hanks, as the holder of negotiable paper, received in good faith before maturity, without notice, and in the absence of a circumstance tending to show fraud in the di-

version of the note, will be protected. An inspection of the note itself gave no notice to plaintiff of any agreement, condition or restriction between the respondents and Hanks, under which it was intrusted to Hanks. As we have seen, the fact that it was made to the order of the plaintiff bank was not sufficient to put plaintiff upon inquiry. Negotiable paper differs from ordinary contracts in writing in this essential way: A holder of a negotiable promissory note, even though he be a wrongful holder, or one between whom and the maker or indorser of the note the note would not be good, may transfer the paper to an innocent person, who, if he takes in good faith, without notice and for value, has a good title as against the maker or indorser. (Norton on Bills and Notes, page 12; *Burson* v. *Huntington*, 21 Mich. 430.)

The case of *Farmers' & Mechanics' Bank* v. *Hathaway*, 36 Vt. 539, cited by respondents, was entirely different on its facts. It involved a note not negotiable on its face, and transferred to the indorser with notice that the payee refused to negotiate the note. A later Vermont case in point, however, is that of *Quinn* v. *Hard*, 43 Vt. 375, wherein the court distinguished the *Mechanics' Bank Case, supra,* and emphasized the fact that in that case the note was not negotiable, and did not import that it was primarily designed to be delivered to the indorser, who was not the payee named in the note. The court decided that an accommodation maker or surety, by signing and intrusting a note with the maker to be delivered, gave to the maker an apparent authority to use the note for the purpose to which it was applied, and that plaintiff in that case was justified in accepting it, as he did, upon the faith that Lane, the maker, had such authority from the surety. Here Hanks not only had apparent authority to negotiate the note, but he had actual authority to do so, although we are assuming his actual authority was to negotiate it in a manner and for a purpose different from those pursued.

Respondents, by their authorization to Hanks to negotiate the note, created the relation by means of which Hanks' wrong was committed. They deliberately gave the appear-

ance and the reality of validity to the note. "The balance of equity," upon the assumed facts as well as upon the true ones, is in favor of the plaintiff, the *bona fide* holder for value and without notice. (*Am. Ex. National Bank* v. *N. Y. B. & P. Co.*, 148 N. Y. 698, 43 N. E. 168.)

These views dispose of the case. They apply to the note in suit as well as to preceding ones. The district court erred in giving the several instructions to the jury which embodied contrary rules. The judgment is reversed, and the cause remanded, with directions to grant a new trial.

*Reversed and remanded.*

PEMBERTON, C. J. concurs. PIGOTT, J. disqualified.